# Exhibit A

IN THE CIRCUIT COURT OF THE SEVENTH JUDICIAL CIRCUIT,
IN AND FOR FLAGLER COUNTY, FLORIDA

CASE NO.: 2024-CA-000638

PAUL D. MEYERS and his spouse,
MARYANN MEYERS,

    Plaintiffs,

v.

R. J. REYNOLDS TOBACCO COMPANY,
PHILIP MORRIS USA, INC., and PUBLIX
SUPERMARKETS, INC.,

    Defendants.

## FIRST AMENDED COMPLAINT AND DEMAND FOR TRIAL BY JURY

    1.    **Plaintiff,** PAUL D. MEYERS, is presently and/or has at all times material hereto been a resident of the State of Florida. His spouse, MARYANN MEYERS, is presently and/or has at all times material hereto been a resident of the State of Florida.

    2.    PAUL D. MEYERS was born on January 27, 1945. He began smoking cigarettes before the age of fifteen (15). He smoked 1 ½ to 2 packs per day throughout his life. He smoked Winston and Salem early on but primarily smoked Raleigh, Viceroy and Pall Mall. After repeated and strenuous efforts, PAUL D. MEYERS was able to overcome his addiction to cigarettes enough to stop smoking around March of 2012. Around June 2022 PAUL D. MEYERS was diagnosed with chronic obstructive pulmonary disease and later in July 2023 he was diagnosed with lung cancer.

    3.    **Cigarette manufacturing Defendant.** The following "cigarette manufacturer Defendant" was a foreign corporation doing business in the state of Florida, which at times material to this action designed, manufactured, advertised, marketed, and sold cigarette products for human consumption which proximately caused injury to Plaintiff: R.J. REYNOLDS TOBACCO COMPANY.

    4.    **Jurisdiction.** This is an action for damages in excess of Fifty Thousand Dollars ($50,000.00). Cigarette manufacturer Defendant is subject to the jurisdiction of this court pursuant to §48.181 and/or §48.193, §48.191, FLORIDA STATUTES, their previous enactments, and other statutes, because at times material to this action:

        a.    Defendant operated, conducted, engaged in, or carried on a trade, business or business venture within Florida; to wit the distribution and sale of

    cigarette products, which trade, business or business venture is connected to or incidental to the matters of this suit;

  b. Defendant was engaged in substantial and not isolated activities in Florida;

  c. Defendant had offices or agencies in Florida;

  d. Defendant transacted business from business offices in Florida;

  e. Defendant, through brokers, jobbers, wholesalers or distributors, sold a product or products that caused harm to persons in the state of Florida;

  f. Defendant conducted advertising activities in the state of Florida;

  g. Defendant intentionally availed itself of the Florida market;

  h. Defendant conducted other activities presently unknown in the state of Florida which subjects it to jurisdiction.

5. **Cigarette products.** Plaintiff purchased and used cigarette products designed, manufactured, advertised and marketed by the cigarette manufacturer Defendant at times material to this complaint.

6. **Propensity for harm.** Defendant's cigarette products, when used as intended, were highly likely to cause, or contribute to in substantial fashion, the following human illnesses, injuries, and conditions, including but not limited to:

  a. broncho genic carcinoma or lung cancer of all cell types.

  b. chronic obstructive pulmonary disease of all types, including emphysema, chronic bronchitis, and irreversible airway obstruction.

  c. cardiovascular disease including atherosclerosis and its consequences, including myocardial infarction (heart attack), cerebrovascular accident (stroke), peripheral vascular disease, aneurysm, and other conditions.

  d. cancers of the kidney, bladder, brain, larynx, and other organs.

  e. genetic damage to cells of the airways, lungs, and other organs.

  f. impairment of lung function.

  g. other types of injuries.

7. So highly likely were the serious health consequences of Defendant's cigarette products that over one in two foreseeable users would be expected to suffer premature death or serious impairment.

8. At all times material hereto, the ordinary consumer, including the Plaintiff, did not in the exercise of ordinary diligence know of the likelihood of, or the severity of, the risks from Defendant's cigarette products, which risks are outlined above.

9. The Defendant's cigarette products, when used as intended, were highly likely to induce in foreseeable users a state of addiction, habituation, habit formation, and/or dependence, characterized by users' great difficulty in terminating or restricting their chronic use.

10. The risks of harm to foreseeable users, as listed in the above paragraphs, would increase in any of the following circumstances:

   a. greater cumulative consumption, including rate of consumption and length of time the product was consumed.

   b. beginning use at an early age in life.

11. At all times material hereto, Defendant conducted an aggressive marketing and advertising campaign intended to induce, encourage, suggest, and reinforce foreseeable users to purchase their cigarette products. Such marketing and advertising occurred in printed media, on television, radio, billboards and by other means.

12. Defendant's business models depended upon aggressively marketing cigarettes to underage persons, grooming them to become regular addicted smokers before they reached the age of majority. Defendant did this because Defendant knew that (1) the earlier a person begins smoking, the stronger the addiction becomes and (2) very few persons initiate smoking after reaching the age of eighteen (18).

13. Defendant's business models succeeded with the Plaintiff who began smoking cigarettes before at the age eighteen (18) and became a regular addicted smoker soon thereafter.

14. Defendant's business models also depended upon creating and maintaining a state of addiction in the brains of the smokers. But for addiction, the vast majority of smokers, including the Plaintiff would desist from smoking and purchasing the Defendant's cigarettes.

15. As a result of the facts set out in paragraph fourteen (14) above, the Defendant's business models depended upon the Defendant designing, manufacturing and marketing a tobacco product that would cause and maintain a high state of addiction in its users. The Defendant accomplished this by artificially manipulating the structure of the tobacco in the Defendant's cigarettes and adulterating the tobacco with additives in order to render the smoke from the burning tobacco more addictive.

16. The Defendant's model was successful in the case of the Plaintiff who became addicted to cigarettes very quickly after first "experimenting" with smoking. The Plaintiff remained addicted to cigarettes throughout his life until he was finally able to stop smoking.

17. Plaintiff purchased and used Defendant's cigarette products within the state of Florida and in other jurisdictions at times material to this complaint.

18. Plaintiff used the Defendant's cigarette products in the intended manner and without significant change in their condition from purchase.

19. Plaintiff was induced to purchase the cigarette products, relied upon the manufacturer's superior knowledge regarding cigarette products and was impliedly or expressly instructed in their use by Defendant's advertising, marketing and other efforts.

20. Plaintiff affirmatively alleges comparative negligence in the consumption of cigarette products.

21. As a direct and proximate result of Plaintiff's use of the Defendant's cigarette products, Plaintiff developed chronic obstructive pulmonary disease and lung cancer from which the Plaintiff still suffers as a result.

## COUNT I
## NEGLIGENCE OF CIGARETTE MANUFACTURER DEFENDANT
## R.J. REYNOLDS TOBACCO COMPANY

Plaintiff realleges paragraphs (l) through (21) as though fully set out and in addition thereto states:

22. At times material to this action, the Defendant, R.J. REYNOLDS TOBACCO COMPANY (herein after R.J.R.), was in the business of manufacturing, promoting, and selling tobacco-based products that had been engineered to be addictive. R.J.R. owed a duty to the Plaintiff to exercise reasonable care in the conduct of its business activities, including the design, marketing, and selling of its tobacco-based products.

23. At all times material hereto, R.J.R. knew that its products were designed to produce smoke that would come into contact with the delicate tissues of the lungs of persons using the products . R.J.R also knew that the smoke from it products contained at least two hundred and fifty (250) poisons and carcinogens, including but not limited to: carbon monoxide, hydrogen cyanide, ammonia, acetaldehyde, arsenic, benzene, cadmium, formaldehyde, polonium-210, polycyclic aromatic hydrocarbons (PAHs) tobacco-specific nitrosamines (TSNAs) and more. R.J.R. knew that the lungs of persons using its products were highly vulnerable to the poisons and carcinogens in the smoke from its tobacco products which would over time cause serious damage to the lung tissues.

24. At all times material hereto, R.J.R. also knew that addicted smokers would need to inhale ten (10) to fifteen (15) doses of poison and carcinogen filled smoke into their lungs a

minimum twenty (20) times daily in order to service the addiction engineered into R.J.R products, about one hundred thousand toxic exposures annually.

25.     R.J.R. during all relevant times also knew that ninety percent (90%) of addicted smokers, including the Plaintiff, would be unable to stop using R.J.R smoking products despite their desire to do so. R.J.R. knew therefore that large numbers of addicted smokers, including the Plaintiff, would be unable to stop smoking before exposing the delicate tissues in their lungs to the poisons and carcinogens in R.J.R. products over a period of many years. R.J.R knew during all relevant times that exposure to its products over many years would more likely than not cause serious bodily injury including lung cancer and consequent death.

26.     During all relevant times, the Defendant R.J.R. knew children and minors exposed to nicotine are more likely to become addicted and more likely to become more deeply addicted to nicotine than persons exposed at a more mature age.

27.     During all relevant times, the Defendant R.J.R. knew that the more deeply addicted a person is to the nicotine in its tobacco-based products the more difficult it would be for the person to stop using the products.

28.     R.J.R. knew that the vast majority of the persons who purchase and use its products do so only because the persons are addicted to the nicotine in its products.

29.     R.J.R. also knew that the vast majority of the persons using its products had become addicted to the nicotine in its products before reaching the age of majority.

30.     As a result, during all relevant times, R.J.R. operated a business model that depended upon the grooming, exposing, and addicting of teenagers, adolescents, and minors, including the Plaintiff, to the nicotine in its tobacco products.

31.     To accomplish this, R.J.R. spent vast sums of money associating its products with youthfulness, pleasure, and fashion in such a way as to entice underage teens to experiment with its products and become addicted. R.J.R knew that the majority of these persons after becoming addicted, would be unable to overcome their addiction, and as a result would develop serious and/or fatal health consequences from their addiction.

32.     During all relevant times, R.J.R.'s tobacco-based products were unreasonably dangerous especially for underage persons such as the Plaintiff because R.J.R.'s products had been designed and engineered to be highly addictive, very attractive to underage persons, and, when used over time, were extremely dangerous to users.

33.     During all relevant times, the R.J. Reynolds Tobacco Company violated its duty of care as a designer, manufacturer, and marketer of tobacco-based products:

    a.     By adopting and operating a business model that included the grooming of minor children, teenagers and adolescents and inducing them to experiment with R.J.R. tobacco based products while underage and to thereby become addicted to its products;

  b. By manipulating the structure of the tobacco in its products, introducing additives to its products, and manipulating nicotine levels in its products for the purpose of addicting underage persons to its products and keeping them addicted;

  c. By adopting a business model that depended upon engineering its cigarette products to make the products more addictive than they would otherwise have been;

  d. By adopting a business model that depended upon introducing additives to its cigarette products in order to create and sustain addiction in smokers;

  e. By adopting a business model that depended upon taking deliberate action to prevent smokers from breaking their addiction to its products;

  f. By adopting a business model that depended upon concealing from smokers and the public the full extent of the dangers associated with the use of its cigarette products.

  34. As a direct and proximate result of the negligence of the Defendant RJR as set out above, the Plaintiff began using the Defendant's cigarette products while underage, became addicted to the Defendant's cigarette products, was, despite efforts, unable to break the addiction, purchased and consumed R.J.R.'s manufactured tobacco based products daily for more than twenty pack years, contracted chronic obstructive pulmonary disease (COPD) and lung cancer. But for the negligence of the Defendant, as set out above, the Plaintiff would not have become addicted to the Defendant's products, or would have been able to overcome the addiction, would not have been subjected to long term exposure to the poisons and carcinogens in the Defendant's products, would not have contracted COPD and lung cancer.

  WHEREFORE, the Plaintiff seeks damages from the Defendant for pain and suffering, mental distress, loss of the ability to lead a normal life, medical expenses, and lost wages in the past, medical expenses, lost earning capacity, pain and suffering, mental distress, and loss of the ability to lead a normal life in the future, costs, and such other relief as the Court may deem appropriate and demands a jury trial on all issues so triable.

**COUNT II**
**STRICT LIABILITY OF DEFENDANT CIGARETTE MANUFACTURERS**
**R.J. REYNOLDS TOBACCO COMPANY**

  Plaintiff realleges paragraphs (1) through (21), and as though fully set out and in addition thereto alleges:

  35. During all relevant times, R.J. Reynolds Tobacco Company (hereinafter R.J. Reynolds) was in the business of designing, marketing, promoting, and selling tobacco based products.

36. During all relevant times, R.J.R.'s tobacco based products reached the possession of the Plaintiff and were consumed by the Plaintiff in a condition unchanged from that of the products when they left the custody and control of R.J.R.

37. The tobacco based products designed, marketed, promoted, and sold by R.J.R. and purchased and consumed by the Plaintiff were unreasonably dangerous due to the products (a) having been designed and engineered to be highly addictive and thus more addictive than they would have otherwise been; (b) having been designed, marketed, and promoted to underage consumers, including the Plaintiff; (c) having been filled with compounds and additives to enhance their addictive qualities; (d) having been fitted with filters that were utterly ineffective at removing hazardous substances from the smoke thereby luring consumers into a false sense of security; (e) having been designed and manufactured to produce at least two hundred fifty (250) poisons and carcinogens, including but not limited to: carbon monoxide, hydrogen cyanide, ammonia, acetaldehyde, arsenic, benzene, cadmium, formaldehyde, polonium-210, polycyclic aromatic hydrocarbons (PAHs), and tobacco-specific nitrosamines (TSNAs); and (f) having been designed and manufactured in such a way as to cause lung cancer, Chronic Obstructive Pulmonary Disease (COPD) and other serious and deadly diseases when used over time as intended.

38. The Plaintiff, having been successfully groomed and captured by R.J.R.'s marketing and promotional efforts, began to consume R.J.R. tobacco based products while the Plaintiff was underage. As a direct and proximate result of the unreasonably dangerous condition of R.J.R products, as outlined above, the Plaintiff became quickly addicted to R.J.R. products. As a direct and proximate result of the Plaintiff's addiction to R.J.R. products, the Plaintiff consumed R.J.R. products daily for over twenty (20) years. And, as a direct and proximate result of the Plaintiff's consumption of R.J.R. products, the delicate tissues in Plaintiff's lungs were exposed to the poisons and carcinogens contained in the smoke from R.J.R. products. As a direct and proximate result of the exposure of the delicate tissues in the Plaintiff's lungs to the poisons and carcinogens in the smoke from R.J.R. products, the Plaintiff developed lung cancer and Chronic Obstructive Pulmonary Disease (COPD). But for the unreasonably dangerous condition of R.J.R. tobacco based products, as outlined above, the Plaintiff would not have become addicted to the products and/or would have been able to overcome the addiction; the Plaintiff's lungs would not have been exposed to the poisons and carcinogens in the smoke from R.J.R. tobacco products; and the Plaintiff would not have contracted lung cancer and COPD.

WHEREFORE, the Plaintiff seeks damages from the Defendant for pain and suffering, mental distress, loss of the ability to lead a normal life, medical expenses, and lost wages in the past, medical expenses, lost earning capacity, pain and suffering, mental distress, and loss of the ability to lead a normal life in the future, costs, and such other relief as the Court may deem appropriate and demands a jury trial on all issues so triable.

# COUNT III
# FRAUDULENT MISREPRESENTATION
# R.J. REYNOLDS TOBACCO COMPANY

Plaintiff realleges paragraphs (1) through (21) as though fully set out and in addition thereto alleges:

39. At all relevant times, the Defendant, R.J. REYNOLDS TOBACCO COMPANY, as the manufacturer and seller of cigarette products, was in a position of knowledge regarding the dangerousness of those products greater than that of its customers and potential customers, including the Plaintiff. Additionally, the Defendant had overwhelmingly greater financial resources (gained from the manufacture and sale of its products) than its customers and potential customers, including the Plaintiff. Due to its greater knowledge and greater financial resources, and due to the hazards which the Defendant knew were posed by the normal and intended use of its products, the Defendant owed its customers and potential customers, including the Plaintiff, a duty to accurately and completely disclose to them information which it possessed or could have reasonably obtained regarding the dangers of the use of it's products and to refrain from the dissemination of misleading and inaccurate information to them.

40. Moreover, the Defendant, through its agents, alter egos and servants assured the Plaintiff that the Defendant would truthfully and accurately disclose relevant information regarding the health risks associated with consuming the Defendant's cigarettes.

By way of example, the Tobacco Industry Research Committee (TIRC), which was at all relevant times an agent or alter ego of the Defendant stated in over 400 newspapers circulated throughout North America including newspapers read regularly by the Plaintiff on January 4, 1954 in a statement entitled "A Frank Statement to Cigarette Smokers:"

   a. "We accept an interest in people's health as a basic responsibility, paramount to every other consideration in our business."

   b. "We always have and always will cooperate closely with those whose task it is to safeguard the public health."

   c. "Regardless of the record of the past, the fact that cigarette smoking today should even be suspected as a cause of a serious disease is a matter of deep concern to us."

   d. "We are pledging aid and assistance to the research effort into all phases of tobacco use and health."

   e. "For this purpose we are establishing a joint industry group ... known as the TOBACCO INDUSTRY RESEARCH COMMITTEE."

   f. "In charge of the research activities of the Committee will be a scientist of unimpeachable integrity and national repute. In addition, there will be an Advisory Board of scientists disinterested in the cigarette industry. A

    group of disinterested men from medicine, science, and education will be invited to serve on this board. These scientists will advise the Committee on its research activities."

  g. "This statement is being issued because we believe the people are entitled to know where we stand on the matter and what we intend to do about it."

  In numerous other statements, the Defendant directly and through various agents assured the Plaintiff, smokers, and members of the public that it would be fully truthful regarding the health effects and smoking and would disclose the truth about the harms and dangers of its products as discovered through the Defendants scientific study and research.

  41. The Defendant also knew that the filters attached to its tobacco based products were utterly ineffective and that the presence of the filters did nothing more than lure consumers including the Plaintiff into a false sense of security. The Defendant knew that consumers of its products would understand "filters" to be devices that removed harmful elements such as air "filters" or water "filters". The Defendant knew that its attachments were not in fact "filters" at all. And yet the Defendant deliberately misled consumers including the Plaintiff into thinking that it's attachment did in fact "filter" out harmful products in the smoke from its products and that its tobacco based products with "filters" were therefore safe or at least safer. This was completely false and the Defendant knew that it was false.

  42. The Defendant's conduct in claiming that its attachments were "filters" making its products safe or safer continued from the 1950s up to and including the time of the filing of this lawsuit. The wrongful conduct and deceit applied to all of the tobacco based products purchased and consumed by the Plaintiff in that all such products had the attachments and were marketed as having "filters".

  43. All of the above facts and the Defendant's own certain knowledge of these facts were concealed by the Defendant and its agents from the public, smokers generally and the Plaintiff in particular.

  44. In addition, at relevant times, the Defendant engaged in a massive advertising and marketing campaign directed at smokers and potential smokers including the Plaintiff. The message of this campaign was that smoking was healthy and a normal positive part of modern life all of which was intended by the Defendant to conceal and cover up the dangers which the Defendant knew were associated with the use of its products.

  45. The statements, omissions, and representations of the Defendant were of material fact and were material to the decisions of smokers including the Plaintiff to begin and continue using the Defendant's cigarette products.

  46. The Plaintiff relied upon the above mentioned representations and omissions of the Defendant in deciding to begin and continue using the Defendant's products.

47. At all relevant times, when the Defendant made the above referenced misrepresentations either by concealment or by direct false statement, the Defendant knew or should have known that such statements or concealments were material to persons such as the Plaintiff in making decisions on smoking and that such persons would rely upon and did rely upon the Defendant's false statements and concealments.

48. The above mentioned representations by the Defendant were false and misleading. They were material facts. They were made intentionally by this Defendant.

49. At all times material hereto, the Defendant intended to induce the Plaintiff to act on the said misrepresentations and to buy its products and to consume its products becoming addicted to its products, thus creating a source of income for the Defendant.

50. The Plaintiff reasonably relied on the above mentioned misrepresentations by the Defendant and purchased the Defendant's cigarette products, consumed the Defendant's tobacco based products, and ultimately suffered lung cancer and COPD, as a direct and proximate result of relying upon these statements and omissions. But for the above misrepresentations, the Plaintiff would not have purchased and consumed the Defendant's tobacco based products and would not have suffered lung cancer and COPD.

51. Specifically, the Plaintiff was aware of the Defendant's representations regarding the safety benefits of its "filters". The Plaintiff believed these representations and relied upon the representations of the Defendant in deciding to purchase and consume the Defendant's products. The Plaintiff's reliance upon the Defendant's representations continued up the point of the Plaintiff's diagnosis with lung cancer and COPD.

52. At no time material to the issues in this lawsuit did the Defendant inform the Plaintiff that the attachments to its cigarettes did not "filter" or remove harmful products from its cigarette smoke. Specifically, the Defendant did not inform the Plaintiff through package inserts or otherwise that the attachments to its cigarettes were not in fact "filters" of harmful products.

WHEREFORE, the Plaintiff seeks damages from the Defendant for pain and suffering, mental distress, loss of the ability to lead a normal life, medical expenses, and lost wages in the past, medical expenses, lost earning capacity, pain and suffering, mental distress, and loss of the ability to lead a normal life in the future, costs, and such other relief as the Court may deem appropriate and demands a jury trial on all issues so triable.

## COUNT IV
## CONSPIRACY

Plaintiff realleges paragraphs (1) through (21) as though fully set out and in addition thereto allege:

53. At relevant times to the claims set forth herein the following persons and entities entered into an agreement to conceal the dangers of cigarette smoking from the public, including the Plaintiff:

    Brown and Williamson Tobacco Company, individually, and as successor by merger to the American Tobacco Company

    B.A.T. plc

    U.S. Tobacco Company

    Philip Morris USA Inc. f/k/a Philip Morris Inc.

    R.J. Reynolds Tobacco Co., individually, and as successor by merger to Brown & Williamson Tobacco Corporation and successor through merger to The American Tobacco Company

    Liggett Group, LLC f/k/a Liggett Group Inc., and Liggett& Myers Tobacco Co.

    Vector Group Ltd. Inc., as successor to Liggett Group Inc. and/or f/ka Brooke Group Ltd., Inc.

    Brooke Group Holding, Inc.

    T.I.R.C. (Tobacco Institute Research Counsel)

    Lorillard Tobacco Company f/k/a P. Lorillard

    CTR (Counsel for Tobacco Research)

    TI (Tobacco Institute)

    Hill and Knowlton, Inc.

    Shook and Hardy, P.A.

    Other unnamed coconspirators

54.     The conspiracy existed at all times material to this lawsuit.

55.     By virtue of their collective dominance of the cigarette industry, their political and financial influence, their force of numbers, and their acting in unison, the conspirators possessed a peculiar power of coercion which power they each individually could not possess.

56.     The purposes of the conspiracy were:

    a.     To conceal knowledge of the harmful effects of cigarette smoking from the public.

  b. To frustrate the flow of information from the medical and scientific community to the general public on the health risks and addictive nature of cigarettes.

  c. To create an illusion of conducting scientific research on cigarettes so as to mislead the public into believing that cigarettes were safe to smoke, when in reality no such bona fide research was ever conducted.

  d. To improperly influence law and policy in local, state and national government by is representing the state of scientific knowledge about the health effects of cigarettes.

  e. To improperly influence physicians, health workers, teachers, and others in the community to subvert these persons' belief in the dangers of cigarette smoking, so as to minimize the instructions and recommendations on smoking cessation that would otherwise have been forthcoming.

  f. To sell cigarettes to minors to ensure a future market for cigarettes as older smokers died.

  g. To addict persons to cigarettes.

  h. To continue the addiction of persons who had already begun smoking.

  i. To create the illusion that a medical and scientific "controversy' existed as to whether or not cigarettes were harmful to human health when in truth and fact no such controversy existed, so as to encourage the public to start or to continue smoking cigarettes.

  j. To disseminate material misrepresentations of fact to the public including the Plaintiff intending to deceive the public including the Plaintiff. Such representations were ultimately relied on by the Plaintiff causing the Plaintiff to use, consume, purchase, and become addicted to the Defendant's product.

57. Over the years the conspirators, acting in concert, performed numerous overt acts to further the purposes of the conspiracy. Because many of these acts were concealed, Plaintiff is not able to state all overt acts but alleges the following as examples:

  a. A meeting between conspirators in 1953 to form the T.I.R.C. (now CTR), which would have as its stated purpose the promotion of research on cigarette dangers, but which in fact was a public relations tool to spread disinformation on the dangers of smoking.

b. Various and sundry meetings over the years of T.I.R.C. and its successor C.T.R. wherein the conspirators discussed and acted upon their previously stated goals.

c. Research studies funded by T.I.R.C. which avoided the issue of cancer and addiction and instead focused on other matters, while giving the public the appearance that the "cancer question" was under "investigation."

d. The publication by the conspirators of "A Frank Statement to Cigarette Smokers" promising to the public to do research to reveal the truth about cigarette dangers, when in fact these dangers were already well known and the conspirators had no intent to do meaningful research.

e. A publication sent to over 200,000 physicians in the United States claiming that cigarette smoking dangers were not real, w hen in fact the conspirators knew that such dangers were real.

f. A magazine article appearing in TRUE magazine paid for by conspirators but appearing to be a bona fide article by a respected author, deliberately misstating the dangers of cigarette smoking.

g. The creation of the Tobacco Institute, of which the conspirators were members and directors, with the purpose of providing disinformation to media and others on the dangers of cigarette use.

h. The suppression of and refusal to publish of, various and sundry research studies carried out by coconspirators which revealed that cigarette smoking was harmful and addicting.

i. Various and sundry meetings over the years of the Tobacco Institute wherein the conspirators discussed and acted upon their previously stated goals.

j. Various and sundry publications, news releases, telephone calls, contacts with the press, the media, the government, and others, by the Tobacco Institute and others in the conspiracy, consisting of suggestions to the media to present the "others side" of the "health controversy" about cigarettes, and to quote tobacco industry sources when reporting on scientific developments showing the dangers of cigarette smoking, which suggestions were accompanied by references to the amount of advertising carried in the magazine or newspaper and threats that such advertising would be dropped if the magazine did not comply.

k. Numerous statements in the period 1950-1962 falsely criticizing scientific publications and reports which showed that lung cancer and other diseases were caused by cigarette smoking.

l.      A publication in 1953 by T.I.R.C. 18 pages long containing false statements about the connection between smoking and lung cancer, sent to various sources.

m.     Statements and publications by Clarence Cook Little, spokesman for coconspirator T.I.R.C., to the effect that the scientific evidence showing the dangers of cigarettes smoking were "not proven" or were "merely statistical," including but not limited to statements made in Atlantic magazine in 1957. Said statements were made with intent to deceive the public into believing that cigarette smoking was safe.

n.      Lobbying efforts in the period 1962-1966 to prevent or frustrate the passage of the Cigarette Labeling Act of 1965, and similar efforts in 1969 and 1984, which involved making false statements to congress and the press about the dangers of cigarette smoking.

o.      A 1985 publication entitled "Of Cigarettes and Science" authored by coconspirator R.J. Reynolds falsely claiming that cigarettes did not cause heart disease, which publication was the subject of an F.T.C. charge of false advertising.

p.      Testimony before congressional subcommittees in 1994 by coconspirators, to the effect that cigarette smoking was not addictive and not harmful, when such assertions were false and known to be false.

q.      A national advertising campaign in 1984, challenging that the "studies which conclude that smoking causes disease have regularly ignored significant evidence to the contrary." (R.J. Reynolds advertisement, *Can we have an open debate about smoking?* (1984)) No such evidence ever existed.

r.      A statement by coconspirator Reynolds in 1964 before a congressional subcommittee that "[m]any distinguished scientists are of the opinion that it has not been established that smoking causes disease," and claimed a "lack of clinical and laboratory scientific evidence of the relationship between smoking and health." These statements were knowing attempts to mislead the public by misrepresenting the state of knowledge about cigarettes and human health.

s.      A statement by coconspirator Reynolds in 1982 that "science to date after much research including over $100 million funded by our industry, indicates that no causal link [between smoking and human disease] has been shown," and that "there is absolutely no proof that cigarettes are addictive."

      t.      "Research Reports on Tobacco and Health", generated on behalf of the Defendant by The Tobacco Institute, Inc. and published for many years dispute the known health consequences of smoking. These releases reported on fringe medical theories of the cause of lung cancer, other than cigarettes, in order to allay the public's fear regarding the deadly health consequences of smoking. These theories, as reported by the Tobacco Institute, Inc., for the conspirators include, but are not limited to, the following: that smoking lowers fatty substances in human lungs, that lung cancer is caused by a certain personality, and that emphysema is an outcome of childhood measles.

      u.      Manufacture of cigarettes by coconspirators, acting in concert or individually with knowledge and ratification, in such a way as to control and manipulate the nicotine content in such cigarettes, with the purpose of securing acceptance, habituation, and addiction.

      v.      It has recently come to the public's attention that the tobacco companies have conspired to deceive consumers, continuing to manipulate nicotine levels up to the present day/time in an ongoing attempt to hopelessly addict consumers such as the Plaintiff.

58.     The above-mentioned representations in furtherance of the conspiracy together with the representations and concealment of information outlined in the previous count were false and misleading. They were material facts. They were made either intentionally, recklessly, and/or negligently without knowledge of the truth or falsity of the representations.

59.     At all times material hereto the Defendant and/or their coconspirators, intended to induce the Plaintiff to act on the said misrepresentations and to buy their product and to consume their product, becoming addicted to their product, thus creating a source of income for the Defendant.

60.     The Plaintiff reasonably relied on the above-mentioned misrepresentations by the Defendant and purchased the products, consumed the products, became addicted to the products, and ultimately suffered the diseases and abnormalities as alleged as a result of consuming the product.

61.     The above-mentioned activities of the Defendant, and/or their coconspirators, constituted fraud and/or deceit and/or conspiracy to commit the same.

WHEREFORE, the Plaintiff seeks damages from the Defendant for pain and suffering, mental distress, loss of the ability to lead a normal life, medical expenses, and lost wages in the past, medical expenses, lost earning capacity, pain and suffering, mental distress, and loss of the ability to lead a normal life in the future, costs, and such other relief as the Court may deem appropriate and demands a jury trial on all issues so triable.

## COUNT V
## LOSS OF CONSORTIUM

Plaintiff, MARYANN MEYERS realleges paragraphs (1) through (21) as though fully set out and in addition thereto states:

62. At all relevant times, MARYANN MEYERS was the wife of PAUL D. MEYERS.

63. As a result of the violations of the standards of care as more fully set out in COUNTS I through IV above, MARYANN MEYERS has been damaged in the companionship, comfort, services, and consortium of her husband PAUL D. MEYERS.

WHEREFORE, MARYANN MEYERS demands damages from Defendants an amount to compensate her for her losses, costs, such other relief as the court may deem appropriate, and demands a jury to try all issues so triable.

Respectfully submitted,

**OGLE LAW FIRM**

/s/ William H. Ogle
**WILLIAM H. OGLE, ESQ.**
Florida Bar No.: 367400
**PARAMA K. LIBERMAN, ESQ.**
Florida Bar No.: 107726
444 Seabreeze Boulevard, Suite 800
Daytona Beach, Florida 32118
Telephone No.: (386) 253-2500
Email: OgleLaw@gmail.com
PKLiberman@OgleLawFirm.com
Leah@OgleLawFirm.com
Miranda@OgleLawFirm.com
*For the Plaintiffs*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was furnished by Electronic Mail and through the Florida Court's E-Filing Portal on all counsel listed on the attached Service List on this July 9, 2025.

>    /s/ William H. Ogle
>    William H. Ogle, Esq.
>    FL Bar No. 367400

## SERVICE LIST

**Counsel for R.J. Reynolds Tobacco Company:**
Troy A. Fuhrman, Esq.
HILL WARD HENDERSON
101 East Kennedy Boulevard, Suite 3700
Post Office Box 2231
Tampa, FL 33601
troy.fuhrman@hwhlaw.com
reynolds@hwhlaw.com

Stephanie E. Parker, Esq.
John M. Walker, Esq.
JONES DAY
1221 Peachtree Street, N.E., Suite 400
Atlanta, GA 30309-3053
sberesheim@jonesday.com